# Exhibit A

Exhibit A

2006 WL 2035465
Only the Westlaw citation is currently available.
United States District Court,
C.D. California, Southern Division.

NATIONAL SERVICES GROUP, INC., a Nevada corporation, et al., Plaintiffs,
v.
PAINTING & DECORATING CONTRACTORS OF AMERICA, INCORPORATED, an Illinois corporation, et al., Defendants.

No. SACV06–563CJC(ANX).  |  July 18, 2006.

**Attorneys and Law Firms**

Daniel J. Kessler, Michael Oberbeck, Zachary R. Smith, Burkhalter, Michaels, Kessler & George, Irvine, CA, for Plaintiffs.

Daniel C. DeCarlo, John L. Barber, Lewis, Brisbois, Bisgaard & Smith, Los Angeles, CA, for Defendants.

### ORDER REGARDING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

CARNEY, J.

**\*1** This is an action for product disparagement under the Lanham Act and state defamation law, arising from the publication of two Internet articles about painting companies. The Plaintiffs fall into three categories: (1) the "College Works Painting" entities ("CWP entities"), a group of companies that provide college students with internships managing painting companies in various states, (2) New Image Painting, Inc. ("NIP"), a company that offers painting contractor services to Home Depot customers, and (3) National Services Group ("NSG"), the majority shareholder of the CWP entities and of NIP. Defendant Painting & Decorating Contractors of America, Inc. ("PDCA") is a nonprofit trade organization that represents the interests of painters and decorators. (Horen Decl., ¶ 2.)

In June 2006, PDCA published on its website the two articles that are the subject of this action. The first article, entitled "Dad, I'm Running a Paint Company ... for the Summer," ("CWP article") sets forth a fictional conversation between a father and his college-age daughter, "Lindsey," who has just been accepted into CWP's internship program. The father expresses concern about the CWP entities' legitimacy and professionalism, and asks his daughter twenty fictional "questions and answers" about the entities' operations. According to Plaintiffs, this list contains false and defamatory representations of fact. (Reid Decl., Exh. 2.) The second article is entitled "New Image Painting, A Decision for Independent Painting and Decorating Contractors" ("NIP article.") (Reid Dec., Exh. 3.) It characterizes NIP's practice of contracting with independent painting companies to provide services to Home Depot customers as an unsuccessful business model that "cannot produce a reasonable profit for any legitimate and qualified contractor."(*Id.*)

On June 20, 2006, Plaintiffs filed their Complaint in this action, and an application for a temporary restraining order requiring PDCA to remove the two articles from its website. In an order dated June 28, 2006, the Court granted the temporary restraining order as to the CWP Article, but not as to the NIP Article, and directed PDCA to appear on July 7, 2006 and show cause why a preliminary injunction should not issue enjoining the continued publication of both articles. The parties have since submitted supplemental briefing and have appeared and been heard regarding Plaintiffs' motion for a preliminary injunction. For the reasons set forth below, the Court will issue a preliminary injunction requiring PDCA to remove or delete one statement, referred to below as the "licensing statement," from the CWP Article posted on PDCA's website. The Court will otherwise deny the requested preliminary injunctive relief.

**I. Standard for Obtaining Preliminary Injunctive Relief**
The standard for obtaining a preliminary injunction is similar to that applicable to motions for temporary restraining orders. To prevail, Plaintiffs must show (1) a likelihood of success on the merits of their claims, (2) a significant threat of irreparable injury, (3) that the balance of hardships weighs in their favor, and (4) whether any public interest favors granting an injunction. *Raich v. Ashcroft,* 352 F.3d 1222, 1227 (9th Cir.2003). An alternative test, also used in the Ninth Circuit, requires Plaintiffs to demonstrate either a combination of probable success on the merits and the possibility of irreparable injury, or serious questions going to the merits and that the balance of hardships tips sharply in their favor. *Id.* These tests represent a continuum of equitable discretion, whereby "the greater the relative hardship to the moving

party, the less probability of success must be shown."*Id.*

**II. Application**

**A. Likelihood of Success/Serious Questions Going to the Merits**
**\*2** The Court first must determine whether Plaintiffs have shown a likelihood of success on, or serious questions going to the merits of, their claims. Those claims are for (1) trade libel, (2) libel per se, (3) false and misleading advertising in violation of the Lanham Act, 15 U.S.C. §§ 1125 *et seq.,* (4) unfair competition in violation of California's Unfair Competition Law, Business & Professions Code §§ 17200*et seq.,* (5) intentional interference with existing business advantage, and (6) intentional interference with prospective business advantage. As a section 17200 claim may be predicated on a business practice that violates any other law, *People v. E.W.A.P., Inc.,* 106 Cal.App.3d 315, 319, 165 Cal.Rptr. 73 (1980), Plaintiffs' section 17200 claim is subject to the same standard as their Lanham Act claim.

**1. Lanham Act Claim—Competitive Injury and Commercial Speech**
Plaintiffs' first claim is for product disparagement in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). That section provides in relevant part:

> (1) Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

To prevail on their Lanham Act claim, Plaintiffs must show: "(1) [PDCA] made a false statement ... about [their] product; (2) the statement was made in a commercial advertisement or promotion; (3) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (4) the deception is material, in that it is likely to influence the purchasing decision; (5) [PDCA] caused its false statement to enter interstate commerce; and (6) [Plaintiffs have] been or [are] likely to be injured as a result of the false statement, either by direct diversion of sales from [themselves] to [PDCA], or by a lessening of goodwill associated with [Plaintiffs'] product." *Jarrow Formulas, Inc. v. Nutrition Now,* 304 F.3d 829, 835 n. 4 (9th Cir.2002); *Cook, Perkiss & Liehe, Inc. v. Northern California Collection Service, Inc.,* 911 F.2d 242, 244 (9th Cir.1990). To the extent their Lanham Act claim is based on innuendo rather than literal falsehood, Plaintiffs must show that the challenged statements actually conveyed the implied message and "thereby deceived a significant portion of the recipients."*William H. Morris Co. v. Group W, Inc.,* 66 F.3d 255, 258 (9th Cir.1995). In its Order granting Plaintiffs' request for a temporary restraining order as to the CWP article, the Court ruled that Plaintiffs had shown that serious questions existed regarding whether the CWP article met this standard.

**\*3** PDCA raises two legal challenges to Plaintiffs' Lanham Act claim, both of which focus on the tension between the First Amendment's protection of truthful and nonmisleading commercial speech and the Lanham Act's prohibition on false and misleading statements in "commercial advertising or promotion." PDCA argues that (1) Plaintiffs lack standing to sue under section 43(a) of the Lanham Act because they are not in "commercial competition" with PDCA, and (2) the articles in issue are not "commercial advertising or promotion" subject to the Lanham Act because they are not "commercial speech." As explained below, both arguments are unavailing.

**a. Competitive Injury**
PDCA first argues that "a non-competitor lacks basic standing to even bring a false advertisement type Lanham Act claim."For this proposition, PDCA cites *Coastal Abstract Services v. First American Title Ins. Co.,* 173 F.3d 725, 730, 735 (9th Cir.1999) and *The Jack Russell Terrier Network of Northern California v. American Kennel Club,* 407 F.3d 1027, 1037 (9th Cir.2005). PDCA contends that Plaintiffs are not its "commercial competitors," because Plaintiffs are "for-profit subsidiaries" that own and manage painting businesses, whereas PDCA is a non-profit organization that neither owns nor manages such businesses.

PDCA's cited cases do not preclude Plaintiffs' claim. While it is true that the Ninth Circuit requires a plaintiff on a Lanham Act claim for product disparagement to show it has suffered "competitive injury," there is no requirement that the Plaintiff and the Defendant be exactly the same type of business or both be run for profit. In *Coastal Abstract,* the Ninth Circuit rejected an argument by the defendant, a title insurance company,

that it was not in commercial competition with the plaintiff, an escrow agent, for purposes of the plaintiff's Lanham Act claim. The court declined to focus on whether parties were "in competition," stating that "the crux of [the Ninth Circuit's seminal case on the competitive injury requirement] was that the victim ... had not suffered a *competitive injury."Coastal Abstract,*173 F.3d at 725 (emphasis added). The Ninth Circuit held that the escrow agent's Lanham Act claim was not barred, because the defendant "sought by his statements to divert business from [plaintiff] to [defendant]." *Id.* at 734.

In *Jack Russell,* the Ninth Circuit reaffirmed that "for standing pursuant to the 'false advertising' prong of § 43(a) of the Lanham Act ... a plaintiff must show ... that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant."*Jack Russell,* 407 F.3d at 1037 (*citing Barrus v. Sylvania,* 55 F.3d 468, 469 (9th Cir.1995)(*itself citing Halicki v. United Artists Communications, Inc.,* 812 F.2d 1213, 1214 (9th Cir.1987))). There, the court held that the plaintiff, a former regional affiliate of a national organization devoted to the Jack Russel Terrier dog breed, was not a competitor of the defendant national organization "that has suffered commercial injury." *Id.* at 1037.Although the Ninth Circuit did not provide a detailed explanation of its holding, neither party in that case existed for the purpose of selling goods or services or promoting the interests of commercial entities.

*4 *Coastal Abstract* and *Jack Russel* both stand for the proposition that "competitive injury," rather than an exact congruence between the businesses of the plaintiff and defendant, is the key to standing on a Lanham Act product disparagement claim. In both cases the Ninth Circuit focused not on whether the parties were for-profit or not, or on the structure of their businesses, but on whether the statements in issue tended to divert business from the plaintiff to the defendant. This case is more analogous to *Coastal Abstract* than *Jack Russel,* because both parties in this case either are commercial painting companies or represent the interests of such companies, and the Plaintiffs and the member companies of PDCA compete for painting business. Like the plaintiff in *Coastal Abstract,* Plaintiffs claim that the statements in issue diverted business away from them and towards PDCA's members. Although PDCA is a non-profit organization that itself does not own or manage painting companies, its members are commercial entities in direct competition with the Plaintiffs. To immunize nonprofit trade groups from product disparagement claims would effectively permit commercial entities to avoid Lanham Act liability by speaking through a larger trade group that itself does not own or operate any business. Such a narrow focus on trade associations' nonprofit nature would thwart the purpose of the Lanham Act and ignore the reality that such associations represent commercial interests engaged in commercial competition. Consequently, the Court holds that Plaintiffs have alleged competitive injury sufficient to support their Lanham Act claim.

**b. Commercial Advertising or Promotion**
PDCA next argues that the two articles are not actionable under the Lanham Act because they are not "commercial advertising or promotion" within the meaning of section 43(a). To constitute "commercial advertising or promotion," a statement must be (1) commercial speech, (2) by a defendant who is a commercial competitor of the plaintiff, (3) for the purpose of inducing customers to buy defendant's goods or services, and (4) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within the industry. *Coastal Abstract Service, Inc. v. First American Title Ins. Co.,* 173 F.3d 725, 735 (9th Cir.1999). The statement need not be made in a "classic advertising campaign," and may consist of less formal types of "promotion." *Id.*

According to PDCA, the articles fail the first requirement of the *Coastal Abstract* test because they are not "commercial speech" as the term has been defined in the Supreme Court's First Amendment cases. *See Proctor & Gamble v. Haugen,* 222 F.3d 1262, 1274 (10th Cir.2000)("[T]he meaning of 'commercial speech in the context of § 43(a)(1)(B) of the Lanham Act tracks the First Amendment 'commercial speech' doctrine.") As PDCA points out, the articles do not fall within what the Supreme Court has characterized as the "core" of commercial speech, or "proposals to engage in commercial transactions,"[1] but rather are statements by a nonprofit trade association discussing services provided by non-member companies. However, the mere fact that a speaker is a nonprofit organization does not preclude its speech from being commercial speech, or "commercial advertising or promotion" within the meaning of section 43(a).*See Gordon & Breach Science Publishers S.A. v. American Institute of Physics,* 859 F.Supp. 1521, 1534–35 (S.D.N.Y.1994)(*citing National Artists Mgmt. Co. v. Weaving,* 769 F.Supp. 1224, 1232 (S.D.N.Y.1991) for the proposition that section 43 of the Lanham Act "covers misrepresentations by non-profit and for-profit organizations alike."); 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:71 (4th ed.) (setting forth statements of Representative Kastenmeier and Senator DeConcini from the legislative history of the 1989 amendments to Lanham Act section 43, and quoting both as saying that section 43 applies to

Case 2:15-cv-01984-GMN-GWF   Document 17-1   Filed 12/17/15   Page 5 of 18

National Services Group, Inc. v. Painting & Decorating..., Not Reported in...

2006 WL 2035465

misrepresentations by nonprofit organizations.) Moreover, PDCA is not a disinterested consumer group but an organization that advocates for commercial entities.

[1] See *Gordon & Breach Science Publishers S.A. v. American Institute of Physics,* 859 F.Supp. 1521, 1537 (S.D.N.Y.1994)(*citing City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) for the proposition that the Supreme Court "has described the 'core notion of commercial speech' as 'speech which does no more than propose a commercial transaction.' ")

**\*5** "[T]he difference between commercial speech and noncommercial speech 'is a matter of degree.' " *Proctor & Gamble,* 222 F.3d at 1274 (*citing City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 423, 115 S.Ct. 1505, 123 L.Ed.2d 99, ―― (1993)). The Supreme Court has set forth three factors relevant to determining whether a statement is commercial speech: "(1) whether the statements are in a typical advertising format; (2) whether the statements refer to a commercial product; and (3) whether the defendant had an economic or commercial motivation for making the statements." *New.Net, Inc. v. Lavasoft,* 356 F.Supp.2d 1090, 1111 (C.D.Cal.2004)(*citing Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66–68, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)). While all factors need not be present for speech to be commercial, no one factor is itself sufficient. *Id.* at 1111.Where particular speech includes commercially-motivated statements that are "inextricably intertwined with otherwise fully protected speech," the entirety of the speech may be fully protected. *Gordon & Breach,* 859 F.Supp. at 1540–41 (studies by non-profit publishers of scientific journals, which characterized defendant publishers' journals as superior to plaintiffs' journals, fell "decidedly on the noncommercial, fully protected side of the line" because the publishers were nonprofit entities, the product advertised—academic journals—was constitutionally protected, and the articles addressed "an issue of considerable public significance."); *Riley v. National Federation for the Blind of North Carolina, Inc.,* 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988)("[E]ven assuming, without deciding, that [financially-motivated] speech in the abstract is indeed merely 'commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech.")

Under the *Bolger* analysis, the CWP Article is commercial speech. As to the second *Bolger* factor, the CWP Article is full of negative references to specific commercial services provided by the CWP entities. By contrast, the article refers specifically and favorably to painting services provided by PDCA members, and emphasizes PDCA-affiliated painters' professionalism and qualifications. At one point, the fictional "dad" tells Lindsey that he remembers being "very impressed" with a painting job done on his house by PDCA painters. (Exh. 2 to Reid Decl. re Application for Temporary Restraining Order.) The dad then states that the PDCA painters had signs saying "Accredited Contractor," and that they claimed the term meant that the their company "[was] Accredited by [their] professional trade association, which means that [they] have had to provide evidence of quality business practices, and [they were] required to take continuing education on a yearly basis."(*Id.*) The third *Bolger* factor also weighs in favor of finding commercial speech, because the article appears to have been motivated by PDCA members' economic interest in discouraging individuals from hiring CWP painters. The fact that two of the three relevant factors weigh heavily on the commercial speech side of the line is sufficient to place the CWP Article in the commercial speech category.

**\*6** The NIP Article, however, is properly characterized as non-commercial speech. First, it is not presented in a "typical advertising format" but as a discussion of issues affecting the painting industry. Second, unlike the CWP Article, it does not mention, describe, or promote specific services provided by PDCA members. While the PDCA is mentioned, it is only to provide a basis for the statement "PDCA is imminently qualified to comment about the marketplace of painting and decorating" and to inform painting contractors that "PDCA is the only organization that represents the independent contractor and ... the only organization that will fight back in the marketplace and reveal the shortcomings to homeowners."(Exh. 3 to Reid Decl. re Temporary Restraining Order.) As to the third *Bolger* factor—economic motivation—the NIP article is economically motivated only in an indirect sense. Rather than promoting PDCA members' services to consumers or customers, the article attempts to inform its members of an issue affecting their economic interests. Although NIP's arrangement with Home Depot is discussed, the discussion is an illustration of what the article's author characterizes as an issue of public importance—*i.e.* what he sees as a broad effort by various companies to "roll up" the painting industry. In sum, all three *Bolger* factors weigh against characterizing the PDCA article as commercial speech. To the extent the NIP Article contains what could be characterized as "commercial speech," those statements are inextricably intertwined with discussions of matters of public interest, so as to bring the entire article within the scope of fully-protected speech. Consequently, the NIP article is not subject to

**National Services Group, Inc. v. Painting & Decorating..., Not Reported in...**
2006 WL 2035465

Plaintiffs' Lanham Act claim.

In sum, the Court finds the CWP Article, but not the NIP Article, is susceptible to Plaintiffs' product disparagement claim under section 43(a) of the Lanham Act.

**2. Lanham Act and Defamation Claims—False or Misleading Statements**

Although the Court has determined that only the CWP Article is subject to Plaintiffs' Lanham Act claim, both articles still are the subject of Plaintiffs' state law claims for trade libel and libel per se ("libel claims"). To prevail on either a Lanham Act or a state law defamation claim, Plaintiffs must show that the articles' challenged statements "expressly or impliedly assert [facts] that [are] susceptible to being proved false."*Coastal Abstract Service, Inc. v. First American Title Ins. Co.,* 173 F.3d 725, 730 (9th Cir.1999)(quoting *Weller v. American Broadcasting Companies,* 232 Cal.App.3d 991, 1001, 283 Cal.Rptr. 644 (1991)); *Wilbanks v. Wolk,* 121 Cal.App.4th 883, 902, 17 Cal.Rptr.3d 497 (2004)(To be actionable defamation, a statement's language and tenor must be such as to make it "able reasonably to be 'interpreted as stating actual facts.' ") In addition, falsity is an element of both types of claims. *Jarrow Formulas,* 304 F.3d at 835 n. 4 (listing falsity as an element of a Lanham Act section 43(a) claim); *Unelco Corp. v. Rooney,* 912 F.2d 1049, 1056 (9th Cir.1990)(quoting *Milkovich v. Lorain Journal,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) for the proposition that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, as least in situations ... where a media defendant is involved," and holding that statements about the effectiveness of products were matters of public concern.)[2] On a defamation claim based on statements about a commercial product, the plaintiff bears the burden of proving falsity. *Carver v. Bonds,* 135 Cal.App.4th 328, 344, 37 Cal.Rptr.3d 480 (2005)(on a claim involving consumer information, a matter of public concern, plaintiff bore the burden of proving falsity "even if he is not considered a public figure."); *Unelco Corp. v. Rooney,* 912 F.2d 1049, 1056 (9th Cir.1990).

[2] "The common law rule that truth is a *defense* to alleged defamation with the burden of proof on the defendant ... is superceded by a constitutional rule when the plaintiff is a public official or public figure, or when the statements are matters of public concern published by a media defendant. In those cases, the burden is on the plaintiff to prove falsity."*Moyer v. Amador Valley Joint Union High School Dist.,* 225 Cal.App.3d 720, 725 n. 2, 275 Cal.Rptr. 494 (1990)(emphasis in original)(internal citations omitted). Here, the parties do not dispute that Plaintiffs have the burden of showing falsity on their libel claims.

**\*7** In this section, the Court will examine each statement on which Plaintiffs base their Lanham Act and libel claims to determine if Plaintiffs have met their burden to show the statements contain express or implied false statements of fact.[3] The Court will first examine each statement to determine whether it can reasonably be interpreted as stating actual facts, by examining the "totality of the circumstances ... [*i.e.*] the meaning of the language in context and its susceptibility to being proved true or false."*Moyer v. Amador Valley J. Union High School Dist.,* 225 Cal.App.3d 720, 725, 275 Cal.Rptr. 494 (1990)(internal citations omitted). For each ambiguous statement that could be interpreted to imply allegedly false facts, the Court will then determine whether Plaintiffs have shown a likelihood that a jury will interpret the statement the way they urge. See *Weller v. American Broadcasting Companies, Inc.,* 232 Cal.App.3d 991, 1002 n. 8, 283 Cal.Rptr. 644 (1991)("If a defamation claim is based on allegations of implied defamatory facts, the court must make a threshold preliminary determination whether the published statements could be understood as implying the alleged defamatory content.... If the statements are susceptible of both an innocent and libelous meaning, it is for the jury to decide how they were in fact understood.") The Court will then determine whether Plaintiffs have presented substantial questions as to the falsity of each statement's literal or implied message.

[3] Plaintiffs focus on different statements in their application for a temporary restraining order and their reply in support of their motion for an order to show cause re entry of a preliminary injunction. The Court will discuss the statements set forth in the original application as well in Plaintiffs' reply.

**a. Statements in the CWP Article**

**i. Painting Over Mold and Mildew**

Dad: *How can you possibly learn all that you would need to know about painting and running a business in one week?*

Lindsey: *The tough jobs we leave to the professionals. Since we do not know anything about lead paint, mold, or mildew, we just paint*

> over it. The main office probably does most of the management work.
>
> Dad: *What great customer orientation!*

Lindsey's statement in the above exchange ("the mold and mildew statement") can reasonably be construed to assert that "we"—*i.e.* CWP branch operators and painters—"just paint over" mold, mildew, and lead paint. Plaintiffs argue, however, that the statement implies even more: that (1) painting over lead paint, mold, and mildew constitutes CWP's "overriding policy," and (2) "that a CWP intern would know nothing about lead paint, mold, or mildew."(Reply to Opposition to Order to Show Cause, p. 12.) The question, therefore, is whether Plaintiffs have shown a likelihood that a reasonable reader would interpret the statement as stating or implying that CWP has an overriding policy of painting over lead paint, mold, and mildew, and that CWP interns know nothing about lead paint, mold, and mildew. PDCA for its part, argues that the statement is a mere nonfactual "supposition" by Lindsey, "and cannot be reasonably read to be a statement of fact about the Plaintiffs."(Opposition to Order to Show Cause, p. 12.)

**\*8** The Court believes the most reasonable interpretation is somewhere between Plaintiffs' and PDCA's proposed interpretations. A reasonable reader would not likely construe the statement as expressing an official policy of CWP, because Lindsey is not presented as a CWP officer or current employee with authority to speak on the CWP entities' behalf, nor does she claim to have been instructed on CWP's policies. However, PDCA's interpretation also is unreasonable because the article does not present Lindsey as completely ignorant of CWP's business practices.[4] She already has been "recruited" by a CWP entity, and presumably has received some information from the company about how it operates. Consequently, the Court concludes that a jury is likely to interpret the statement to mean that CWP painters, regardless of what CWP's official policy is, tend to paint over lead paint, mold and mildew.

[4]  There is some force to PDCA's argument that a reasonable reader would not necessarily interpret Lindsey's statements as the author's assertions about CWP because the article does not present Lindsey as an authority on the CWP entities. However, the question at this stage of the case is not whether Lindsey's statements are or are not equivalent to the author's, but whether a reasonable reader *could and is likely to* construe Lindsey's statements as such. Because Lindsey is presented in the article as a new CWP recruit with some knowledge of the company, the Court concludes that a reasonable reader could construe her statements as equivalent to the author's assertions. The

extent to which Lindsey's statements are properly interpreted merely as representing the author's opinion of college students' naivete, as opposed to the author's statements about CWP, ultimately will be for the jury. See *Weller,* 232 Cal.App.2d at 1003, 42 Cal.Rptr. 542 ("If the broadcasts could reasonably have been understood as implying the defamatory statements upon which respondents base their claim, but also could have been understood in an innocent sense, the jury must decide in what manner the broadcasts were ultimately understood.") The question at this stage is merely whether Plaintiffs have shown serious questions on the merits of their claims, or a likelihood that a jury would interpret the statements to convey the meaning Plaintiffs urge.

The next question is whether Plaintiffs have presented sufficient evidence to create serious questions as to the falsity of the statement that CWP painters tend to paint over mold and mildew. The only evidence of falsity Plaintiffs present is the following statement by Mr. Reid:

> In fact, CWP branch operators are trained on proper treatment techniques when encountering mildew. CWP branch operators offer environmentally friendly mildew remediation products in addition to a bleach and tri-sodium phosphate solution offered by most contractors. CWP, like many contractors, does not do lead remediation work. However, CWP does not 'just paint over' the conditions discussed in this question.

(Reid Decl. re Application for Temporary Restraining Order, ¶ 16(c)).

Mr. Reid's declaration is insufficient to create serious questions as to the falsity of the mold and mildew statement. First, Mr. Reid is the Chief Executive Officer of NSG, not CWP, and therefore the foundation for his knowledge of the CWP entities' business practices is unclear. However, even assuming that being NSG's CEO has acquainted Mr. Reid with CWP's training techniques, Mr. Reid provides no foundation for his implied assertion that CWP painters *on the job* actually "do[ ] not 'just paint over' lead paint, mold, and mildew."He does not claim ever to have observed CWP painters at work, or to have been present while they were trained by branch operators. While he states that *branch operators* are trained on mildew remediation techniques, and offer

"mildew remediation products," he does not provide any specifics as to whether and how those training techniques and products are used by CWP's painters. No actual CWP painters or branch operators have submitted declarations regarding the painting techniques used in the field. In contrast, PDCA presents declarations by two individuals whose houses were painted by CWP painters who, the declarations assert, painted over mold and mildew and/or admitted to having used the wrong primer. (Casalena Decl., ¶ 4; Sundwall Decl., ¶ 2.) Overall, Plaintiffs have failed to show the existence of serious questions regarding the mold and mildew statement's falsity.

**ii. Surface Preparation/Responsibility for Failures**

> **\*9** Dad: *Without proper surface preparation and top quality techniques and materials, there is likely to be subsequent failures. Who is responsible for that?*
>
>> Lindsey: *Not sure, but I am only doing this for the summer ... I will be in school.*
>>
>> Dad: *The true meaning of "buyer beware."*

Plaintiffs argue that the above exchange implies that the CWP entities "do [ ] not take responsibility for failures and do[ ] not utilize proper surface preparation."(Application for Temporary Restraining Order, p. 11; Reply in Support of Order to Show Cause, pp .13–14.) PDCA argues that the statement is merely an opinion that does not imply underlying undisclosed facts. The Court agrees with PDCA. In context, the statement could not reasonably be understood as other than the author's subjective opinion that CWP is unlikely to respond adequately to failures because its operators are college students with academic commitments. Lindsey's statement cannot be construed as a factual statement that CWP operators actually deny responsibility, because she is commenting only on her own intent to return to school after her summer internship. To the extent the article states that the CWP entities do not use "proper" surface preparation or "top quality" techniques or materials, the statement is subjective "business puffery" that does not convey or imply facts, and thus is not actionable under the Lanham Act or in defamation. *See Coastal Abstract,* 173 F.3d at 731 (statement that plaintiff was "too small" to handle a client's business was non-actionable "puffery," or "not ... a statement of fact capable of being proved false.")

**iii. Start–Up Costs**

> Dad: *Where is the business office, truck(s) and equipment, and who pays for them?*
>
>> Lindsey: *My business office is here in our house. The family garage is my shop. There are no trucks. We all use family cars. The central office supplies all the equipment, though we do not do power washing, spraying, and we do not use tools ... we just paint things. All you need is a brush and a roller. I am not sure where the ladders come from or how they are transported.*
>
> Dad: *Is this "internship" a real authentic look for kids at paint contracting and what it really takes to be and stay in business?*
>
> Dad: *There are certain inevitable start-up costs ... like buying paint and supplies. Where does that money come from?*
>
>> Lindsey: *That's easy. Your credit card, Dad.*
>
> Dad: *This internship is starting to sound like a family expense for you to have a summer job.*

Plaintiffs argue that the above exchanges convey the message that (1) "CWP does not tell its interns who is responsible for all start-up costs; and (2) ultimately, the intern (or her father) will be on the hook for those costs."(Reply to Opposition to Order to Show Cause, p. 13.) PDCA counters that Lindsey's second statement is merely a "quip" that cannot reasonably be interpreted as a statement of fact. The exchange cannot reasonably be construed to state or imply that CWP does not tell its interns who is responsible for start-up costs, because Lindsey does not claim that she has attended any orientation or training sessions in which CWP would be expected to convey such information to her. However, the statement "your credit card, Daddy," in response to the question who pays for start up costs, can reasonably be and is likely to be construed as a factual statement that CWP's "start up costs" are paid for by interns' parents. The question is whether Plaintiffs have adequately shown that the statement is false.

**\*10** Plaintiffs have failed to present sufficient evidence to raise serious questions as to the statement's falsity, because they do not explain what start-up costs actually are involved in the CWP entities' business or how those costs are paid. To disprove the statement, Plaintiffs present testimony by Mr. Reid that:

> In fact, CWP funds the branch operators business through an account with a national paint store. All initial supplies (including

Case 2:15-cv-01984-GMN-GWF   Document 17-1   Filed 12/17/15   Page 9 of 18

National Services Group, Inc. v. Painting & Decorating..., Not Reported in...

2006 WL 2035465

> sprayer and ladders) are paid for on this account. The profit from the first jobs pays off this initial equipment ... If the branch operator is unsuccessful (or has to quit for some reason) the balance due to the paint account is CWP's responsibility, not the branch operators.

(Reid Decl. re Application for Temporary Restraining Order, ¶ 16(k)). Although Mr. Reid states that "initial supplies" are paid for through the paint store account, it is not clear from his statement whether there are other "start up costs" involved in CWP's business or, if so, how those costs are covered. As PDCA points out, the category of "start up costs" is broad and undefined. Absent explanation by Plaintiffs of what the CWP entities' "start up costs" consist of, how they are paid, or what if any costs are covered by branch operators' parents, the Court cannot conclude that Plaintiffs have shown the existence of serious questions regarding the falsity of the start up costs statement.

**iv. Responsibility for Paintwork Failures**

> Dad: *If the paintwork fails, who is responsible?*
>
>> Lindsey: *That's easy, the manufacturer of the paint.*
>>
>> Dad: *Even when the manufacturer's specifications are carefully followed, paintwork can fail anyhow, due to improper techniques of unqualified painters. The manufacturers have sophisticated methods to test the reasons for paint failure. If the failure is because of improper application, or application to improperly prepared surfaces, the contractor bears full responsibility. In any case, the manufacturer is only responsible for the paint, not the labor.*

Plaintiffs argue that this statement asserts that CWP does not provide warranties for its services. (Reply to Opposition to Order to Show Cause, pp. 13–14.) PDCA counters that the statement is merely "intended to educate consumers on the fact that most failures are contractor related and paint manufacturers only step in when the painter has applied the paint properly by, among other things, properly preparing the surface."(Opposition to Order to Show Cause, p. 17.) While the exchange could be characterized as an expression of the author's opinion that the CWP entities are unreliable or do not sufficiently take "responsibility" for failures, it is too general and subjective to be construed as stating or implying provably false facts. Lindsey's statement that the manufacturer of the paint "is responsible" appears intended to illustrate her own ignorance and the author's opinion that CWP's prospective interns are inexperienced in the painting industry. Lindsey does not claim that anyone from CWP told her that CWP does not provide warranties or take responsibility for particular paintwork failures, nor is her statement presented as an accurate representation of CWP's practice. In sum, it is not "able reasonably to be 'interpreted as stating actual facts.' " *Wilbanks,* 121 Cal.App.4th at 902, 17 Cal.Rptr.3d 497.

**v. Training in Safety Procedures**

> **\*11** Dad: *Where do you learn about safety procedures?*
>
>> Lindsey: *Not sure, but there is a whole week of training. Besides I am not climbing any ladders. I am an "owner!"*
>>
>> Dad: *A prescription for disaster and perhaps even sorrow. Ladders and scaffold work require intense training.*

According to Plaintiffs, this exchange "[i]mplies that CWP does not teach safety procedures," and falsely states that interns receive only one week of training when in reality interns receive additional training every two weeks during the summer. (Application for Temporary Restraining Order, p. 12; Reid Decl., ¶ 16(e)). Defendants argue that the article does not imply that safety procedures are not taught. In context, the exchange can reasonably be construed as a statement that prospective CWP branch operators receive their training during only one week, and an expression of the author's opinion that such training is insufficient. It cannot reasonably be construed to state or imply that safety procedures are not taught at all.

Even construing the statement to be that branch operators receive only one week of training, however, Plaintiffs have failed to present sufficient evidence of falsity to create serious questions as to whether the training statement is actionable in defamation. A statement cannot form the basis of a defamation claim where it is substantially true. *Carver v. Bonds,* 135 Cal.App.4th 328, 344, 37 Cal.Rptr.3d 480 (2005)(*quoting Masson v. New Yorker Magazine,* 501 U.S. 496, 516–17, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)) (" 'California law permits the defense of substantial truth,' and thus a defendant is not liable 'if the substance of the charge be proved true ...'

Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the ... truth would have produced."') Here, Plaintiffs do not dispute that CWP interns receive only one week of safety training before they begin operating their businesses. Their challenge is based on PDCA's failure *also* to state that:

> CWP has and teaches a comprehensive safety and fall protection program.
>
> CWP has invested heavily in safety consultants to ensure both compliance and, most importantly, safe job sites. Safety meetings are held each week with painters and *branch operators attend additional training every two weeks of the summer where safety is always on the agenda.*"

(Reid Decl. re Application for Temporary Restraining Order, ¶ 16(e))(emphasis added).

Mr. Reid's declaration does not controvert that branch managers undergo one week of training on safety procedures. Although he states that *painters* attend weekly "safety meetings," he does not say that branch operators attend those weekly meetings. Mr. Reid's only statement about branch operators is that they attend "additional training every two weeks ... where safety is always on the agenda."Because Plaintiffs do not dispute that interns receive only one week of initial training before beginning work, PDCA's statement that "there is a whole week of training" appears to be substantially true. Mr. Reid's statement that additional safety training is "on the agenda" at subsequent meetings is unlikely to be substantial enough to give rise to a defamation claim.

**\*12** Plaintiffs also have not presented sufficient evidence of materiality to create serious questions as to the merits of their Lanham Act claim based on the training statement. One element of a section 43(a) claim is that a statement must be "material," or likely to influence consumers' purchasing decisions. Here, the difference between (1) a CWP intern receiving one week of safety training before beginning work and (2) a CWP intern receiving one week of safety training before beginning work, plus additional safety training every two weeks at subsequent meetings, is unlikely to be significant enough to affect customers' purchasing decisions. The overriding point of the statement, and likely the most significant point to consumers, is that CWP interns have only one week of training in safety procedures before they begin working as CWP branch operators. Consequently, Plaintiffs have not shown serious questions on the merits of the Lanham Act or defamation claims as to the training statement.

**vi. Hiring Inexperienced Painters**

> Dad: *There is a severe shortage of trained and experienced painters. Where do you get the manpower?*
>
> > Lindsey: *I would hire kids just like me. I can pay them $10 an hour. That is more than they can make working for McDonald's.*
>
> Dad: *The typical union training program for painters is three years long. The training is intense and is supported by on-the-job experience. Merit shop contractors spend years and significant resources training employees. The suggested approach is non-sensical at best and very dangerous at worst. In any case, not in the best interest of anybody.*

Plaintiffs argue that the above exchange "[i]mplies that CWP hires incompetent children for positions that are held only by union members with intense training over the course of years."(Memorandum in Support of Application for Temporary Restraining Order, p. 12.) Lindsey's statement could reasonably be construed to be a factual statement that CWP hires inexperienced college students as painters, in an industry where many workers receive training through unions. However, Plaintiffs present no evidence that the statement is false insofar as it pertains to the CWP entities' services. In fact, Mr. Reid confirms that the CWP entities do, in fact, hire college students as painters. He states:

> In fact, an extremely small percentage of painters are unionized in residential repaints. Moreover, CWP branch operators are trained both in the classroom and in the field with a supervisor to hire and train great employees. These can be a mixture of college students and experienced painters.

(Reid Decl. in Support of Application for Temporary Restraining Order, ¶ 16(i)). Mr. Reid's declaration does not controvert the CWP Article's statement that CWP hires college students, or that those students are not experienced. To the extent Plaintiffs argue that the CWP article falsely portrays painters in general as being union-trained, that statement relates to the marketplace in general and is not defamatory to Plaintiffs.

**vii. Avoiding Operating in States that Require Licensing**

> ***13** Dad: *In this state a paint contractor needs to be licensed. Who gets the license?*
>
> Lindsey: *The central office takes care of all that stuff. I think College Works Painting tries to avoid doing business in states where licensing is required.*
>
> Dad: *If the state government does not care who they license, why should anybody care?*

Plaintiffs argue that this exchange falsely states that the CWP entities have a policy of avoiding doing business in states that require licenses. (Reply to Opposition to Order to Show Cause, p. 15.) PDCA counters that the statement "is not provably true or false as it is just a surmise from the daughter responding to her father."(Opposition to Order to Show Cause, p. 16.) PDCA emphasizes that the statement is premised by the conditional words "I think," and argues that those words render the statement a non-actionable opinion.

"An opinion that does not convey a false factual implication is not defamatory under California law."*Coastal Abstract,* 173 F.3d at 732.However, where a statement does convey such a false impression, couching it as an opinion or conjecture does not preclude defamation or Lanham Act liability. An opinion may be actionable in defamation where it implies "the allegation of undisclosed defamatory facts as the basis for the opinion," or gives an incomplete account of the facts on which the opinion is based. *Wilbanks,* 121 Cal.App.4th at 902–03, 17 Cal.Rptr.3d 497 (defendant's literally true statement that a judgment had been awarded against the plaintiff, a viatical settlement company, was actionable in defamation because the speaker failed to disclose that the settlement was entered in small claims court; statement that California Department of Insurance had investigated a complaint against the plaintiff was also actionable although literally true, because defendant failed to disclose that the department investigated every complaint regardless of merit and the statement falsely implied the Department had concluded the complaint was "worthy of investigation.") Similarly, under the Lanham Act a statement that is not literally false may still be false by "necessary implication" or may be actionable if it actually conveys a false implied message and "thereby deceive [s] a significant portion of the recipients."*William H. Morris Co. v. Group W, Inc.,* 66 F.3d 255, 258 (9th Cir.1995).*See also Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997).

Although the licensing statement is preceded by the words "I think," it can reasonably be construed to imply actual facts susceptible of being proved false—*i.e.* that the CWP entities try to avoid doing business in states that require licensing. Lindsey is presented as having some knowledge of CWP's operations and a reasonable reader would therefore likely conclude that she has some basis for her stated belief that CWP tries to avoid operating in states that require licenses. Her statement thus implies "the allegation of undisclosed defamatory facts as the basis for the opinion."*Wilbanks,* 121 Cal.App. 4th 902–03. The mere use of the words "I think" cannot, in itself, insulate the statement from liability or give rise to constitutional protection. *Weller,* 232 Cal.App.3d at 1004, 283 Cal.Rptr. 644 ("The use of interrogative language alone does not entitle statements to constitutional protection where, as here, they otherwise can be understood as implying defamatory fact."); *Jackson v. Paramount Pictures Corp.,* 68 Cal.App.4th 10, 30, 80 Cal.Rptr.2d 1 (1998)(*quoting Milkovich,* 497 U.S. at 18–19)(*itself quoting Ciani v. New Times Publishing Co.,* 639 F.2d 54, 64 (2d Cir.1980)) ("It would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.' ")

***14** The next question is whether Plaintiffs have presented sufficient evidence to raise serious questions as to whether the implied message is false. They have. Mr. Reid states in his declaration that the CWP entities are "lawfully organized under" California, Colorado, Nevada, Texas and Washington, and are authorized to do business in Virginia, Michigan, Connecticut, Rhode Island, Pennsylvania, Maryland, Massachusetts, New Hampshire, North Carolina, New York, Ohio, Oregon, Utah and Arizona. (Reid Decl. in Support of Application for Temporary Restraining Order, ¶ 3.) Mr. Reid further states that "[f]or each state in which a CWP entity has been incorporated and conducts business, the CWP entity obtains all necessary licenses and permits required by that state's laws, ordinances, and regulations. All advertising materials prepared by any CWP entity specifically list all license numbers applicable to that state."(*Id.,* ¶ 7.) The statement is material to consumers because it strongly suggests that the CWP entities try to avoid the need to obtain licenses, perhaps because they would have difficulty obtaining them. In addition, as Defendants present no basis for believing the statement to be true, Plaintiffs likely will be able to show that Defendants acted with the malice—*i.e.* knowledge that the statement was false or reckless disregard of the truth—necessary to support their state claims for defamation.

Because the licensing statement can reasonably be construed as a statement of opinion based on undisclosed

facts, the statement implies that Plaintiffs attempt to avoid operating in states that require licensing, Plaintiffs have presented substantial evidence that the statement is false, the statement is material, Plaintiffs are likely to be damaged by the statement's continuing publication due to diversion of business away from them, and malice likely can be shown, the Court concludes Plaintiffs have shown a likelihood of success on their defamation and Lanham Act claims as to the licensing statement.

### viii. "Pyramid Business Structure"

> Dad: *National Service Group is the for-profit parent company for College Works Painting. Where does their "profit" come from?*
>
>> Lindsey: *I suppose my company pays them "off the top" for all the stuff I get.*
>
> Dad: *NSG is a pyramid business structure. Selling soap or vitamins out of a garage is not complex or dangerous business. Painting is, and must be treated quite differently.*

Plaintiffs argue that "the implication of this statement [is] that NSG is an illegal or illegitimate business structure," and that "the average reader" will conclude that "there is something nefarious, improper, or illegal to NSG's business plan."(Reply to Opposition to Order to Show Cause, p. 15.) In support of this contention, they quote Black's Law Dictionary's definition of "pyramid scheme," which is:

> A property distribution scheme in which a participant pays for the chance to receive compensation for introducing new persons to the scheme, as well as for when those new persons themselves introduce participants.

*15 BLACK'S LAW DICTIONARY 1272 (8th ed.2004). PDCA's counsel argued at the hearing on the Court's previously-issued order to show cause, on July 7, 2006, that the statement is not defamatory or injurious because the article uses the word "structure" instead of "scheme." According to PDCA's counsel, many legitimate businesses and most large law firms use a pyramid "structure," but do not qualify as pyramid "schemes." PDCA's position appears to be that the "pyramid business structure" statement implies only that the CWP entities have a high ratio of low-level to high-level employees.

The Court believes PDCA's counsel attempts to put too fine a point on the language used in the article. In determining whether a statement is defamatory, the court must consider it in context, as it would be understood by an average person rather than a legal professional. *Hofstedler, Kaus & Ettinger v. Superior Court,* 42 Cal.App.4th 55, 67, 49 Cal.Rptr.2d 551 (1996)."If the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication ... he may be held responsible for the defamatory implication ... even though the particular facts are correct."*Weller,* 232 Cal.App.3d at 1003 n. 10, 283 Cal.Rptr. 644 (*quoting*PROSSER, THE LAW OF TORTS § 116 (5th ed. (Supp.1988))."[I]t is the defamatory implication—not the underlying assertions giving rise to the implication—which must be examined to discern whether the statements are entitled to full constitutional protection."*Id.*

Taken in context, the "pyramid business structure" statement can reasonably be construed, and is likely to be construed by the average reader, to imply not merely that NSG has many employees at a low level and a few at the top, as PDCA urges, but that it is an illegal business where employees pay for the right to recruit other employees. First, the statement follows a question about where NSG's "profit" comes from, and an answer indicating that branch operators' companies pay NSG "off the top." A large organization profiting from an independently operated smaller "company" run by a new recruit suggests a pyramid "scheme" as defined by Black's Law Dictionary, rather than merely a pyramid "structure" with a high ratio of low-to-high level employees. The "pyramid scheme" implication is bolstered by the fact that the statement is made by the father, who is presented in the article as knowledgeable and authoritative about business. Looking at the statement "not as lawyers and judges but by placing ourselves in the position of the hearer or reader ... according to its natural and popular construction,"*Hufstedler, Kaus & Ettinger v. Superior Court,* 42 Cal.App.4th 55, 67, 49 Cal.Rptr.2d 551 (1996), the "pyramid business structure" statement can reasonably be construed, and is likely to be construed by the average reader, to convey the meaning Plaintiffs urge—*i.e.* that NSG is a pyramid scheme.

Plaintiffs have failed, however, to present sufficient evidence to create serious questions as to the statement's falsity. Mr. Reid states in his declaration only that "NSG is a for-profit company," that "forty percent from each job goes to NSG," and that "[f]rom this [forty percent] NSG provides centralized office support, payroll processing, legal compliance, workers comp, liability insurance, field support, recurrent training, marketing material, warranty coverage, and a proven system to run a successful

business."(Reid Decl. in Support of Application for Temporary Restraining Order, ¶ 16(o)). However, whether or not NSG qualifies as a "pyramid scheme" depends not just on what percentage of the proceeds NSG receives from each painting job or what services it provides to CWP operators, but on whether and how much participants pay to become CWP branch operators, how those proceeds are spent, and whether new recruits are required to recruit additional individuals into the company. No evidence is presented on any of those issues. Consequently, Plaintiffs have failed to present sufficient evidence to create serious questions on the merits of the Lanham Act or defamation claims as to the "pyramid business structure" statement.

### ix. Providing Estimates Over the Phone

> **\*16** Dad: *Cost and estimating is very complex and when not done properly spells the difference between profit and loss.*
>
>> Lindsey: *They teach us that stuff in the weeklong training process. Besides, we don't always visit the job site or meet with the homeowner. We give estimates over the phone based on square footage.*
>>
>> Dad: *Can't think of anything to say ... this defies description, based on my experiences buying paint services.*

Plaintiffs argue that Lindsey's statement in the above exchange falsely asserts that CWP employees do not always visit job sites to prepare estimates, and that CWP's website proves the falsity of this assertion by stating in a "Frequently Asked Questions" list that when customers call for estimates CWP responds that "an average 3 bedroom 2 bathroom home will cost approximately $2000 to paint. A Branch Operator can give you an exact number by coming out and giving you an estimate."(Reply to Opposition to Order to Show Cause, p. 16.) The exchange can reasonably be construed as stating the provably false fact that CWP branch operators do not always come to customers' homes to give estimates. As evidence of falsity, Plaintiffs present the following statement by Mr. Reid:

> CWP never gives prices by phone nor does it use a square footage equation. CWP branch operators are trained to conduct a very comprehensive estimate which often takes 1½ to 2 hours. It includes a thorough walk around with the customers to address areas of concern and discuss options. Branch operators are trained both in the classroom and in the field with a supervisor on how to apply specific standards to reach an informed estimate.

(Reid Decl. re Application for Temporary Restraining Order, ¶ 16(m)). However, Mr. Reid's declaration is insufficient to create serious questions as to the statement's falsity, because he does not present any basis for his asserted knowledge of branch operators' actual practice. His declaration states only that CWP has a policy of always visiting the home and not using square footage to provide estimates; it does not include any information on whether this policy actually is followed. No declarations are provided by CWP branch operators or painters as to their actual practice, nor does Mr. Reed claim to have observed such branch operators or painters on the job. Consequently, Plaintiffs have not met their burden on the issue of falsity as to the estimates statement.

### b. Statements in the NIP Article

The NIP article criticizes the business model used by NIP, in which NIP contracts with Home Depot to provide residential painting services to Home Depot Customers and hires independent painting contractors to perform the work as NIP "licensees." (Exh. 3 to Reid Decl. re Application for a Temporary Restraining Order, p. 3.) A significant part of the article is dedicated to criticizing a "business model" that the article asserts NIP provides in its literature. The model sets forth a profit analysis for a painting contractor working with NIP to provide services for Home Depot customers. According to the model, the contractor receives $3,000 from a painting project, and incurs the following expenses:

| Revenues | $3,000 |

**National Services Group, Inc. v. Painting & Decorating..., Not Reported in...**
2006 WL 2035465

| | |
|---|---|
| Home Depot Fee | –390 (13%) |
| NIP | –330 (11%) |
| Paint, Materials, Labor | –1,500 |
| In-store marketing cost | –80 (8 hours at $10/hr.) |
| Net Profit | $700 |

**\*17** Plaintiffs point to six allegedly false and defamatory statements in the NIP Article. Most of these statements are criticisms of the NIP business model shown above. Since the Court already has concluded that the NIP Article is not commercial speech subject to Plaintiffs' Lanham Act claim, in this section the Court will consider only whether Plaintiffs have presented sufficient evidence to create serious questions or a likelihood of success on the merits of their libel claims as to each statement.

**i. "The NIP financial proposal almost begs for corners to be 'cut,' questionable estimating, and sloppy work." / "No consideration at all is given to craftsmanship, safety, continuing education, expertise and experience."**

The above two statements appear in the following paragraph from the NIP Article:

> Another troubling aspect of the NIP proposal has to do with quality performance and execution. The NIP financial proposal almost begs for corners to be "cut," questionable estimating, and sloppy work. No consideration at all is

Case 2:15-cv-01984-GMN-GWF   Document 17-1   Filed 12/17/15   Page 15 of 18

National Services Group, Inc. v. Painting & Decorating..., Not Reported in...

2006 WL 2035465

> given to craftsmanship, safety, continuing education, expertise and experience. NIP makes no mention of how low-end, low-margin contractors will deal with mold, mildew and lead paint when encountered; not to mention VOC's and paint disposal issues. Perhaps the two-day course in Atlanta will cover all these questions and issues. Or, perhaps NIP expects the contractors they "partner" with to be top quality companies and work for a *net loss.*

(Exh. 3 to Reid Decl., p. 5)(emphasis in original.)

Plaintiffs argue that the first statement (the "cutting corners statement") is false because in fact "NIP provides estimating standards and demands a high level of quality and workmanship from its contractors."(Reply to Opposition to Order to Show Cause, p. 20 .) However, in context the statement cannot reasonably be construed to contain express or implied statements of fact about whether NIP provides estimating standards or the level of quality and workmanship it demands from its contractors. The statement is merely a criticism of the feasability of NIP's financial model. In essence, the statement expresses the author's opinion that NIP's model is likely to result in substandard work. No factual statements about NIP's business practices are alleged or implied.

The second challenged statement is that "no consideration at all is given to craftsmanship, safety, continuing education, expertise, and experience" (the "craftsmanship statement.") According to Plaintiffs, the craftsmanship statement falsely implies that "no consideration is given [by NIP] to craftsmanship, safety, [or] continuing education."(Reply to Opposition to Order to Show Cause, p. 20.) In context, however, the statement cannot reasonably be construed to mean that NIP itself does not consider those factors. Rather, the statement is that NIP's *business model* does not take into account costs attributable to craftsmanship, safety, or continuing education. The paragraph refers in its first sentence to NIP's "proposal," and criticizes the proposal for failing to consider or mention certain assertedly critical business variables. The statement cannot reasonably be construed to contain express or implied factual statements about NIP.

**ii. "Among the most difficult aspects of the model to overcome is the complete lack of understanding by both Home Depot and NIP of the painting contracting business."**

**\*18** Plaintiffs argue that the above statement is false because it states NIP does not understand the painting and contracting business. In fact, Plaintiffs argue, "NIP is an experienced, successful painting company."(Reply to Opposition to Order to Show Cause, p. 20.) In the article, the statement is immediately followed by the sentence, "[u]nlike every other Install service provided by Home Depot, paint contracting requires complex estimating, and the cost of products and materials is a small percentage of the price of the total project. For all the other segments of Home Depot's Install Program, it is the other way around."(*Id.*)

The "lack of understanding" statement is non-actionable opinion. Read in context, it simply expresses the author's opinion that the proposed business model in NIP's literature does not sufficiently account for particular characteristics of the painting contracting business—*i.e.* the complexity of the estimating process, and the relative portion of the price of a project attributable to products and materials—and that this deficiency demonstrates a lack of understanding of the painting and contracting business. The statement does not assert or imply any facts susceptible to being proven false. The article discloses the factual basis for the author's stated opinion that NIP's business model demonstrates a lack of understanding of the painting contracting business, and each of those facts relates to the industry in general rather than to NIP's business. Plaintiffs do not contend that those facts—*i.e.* that "paint contracting requires complex estimating" and that products and materials account for a relatively small percentage of a painting project's cost—are false. Consequently, the statement may not form the basis of a libel claim. *See Suzuki Motor Corp. v. Consumers Union of U.S., Inc.,* 330 F.3d 1110, 1117 (9th Cir.2003)(Kozinski, J., dissenting from denial of petition for rehearing en banc.)(*quoting Standing Comm. v. Yagman,* 55 F.3d 1430, 1440 (9th Cir.1995))(*itself quoting Lewis v. Time, Inc.,* 710 F.2d 549, 556 (9th Cir.1983))("Where a publication sets forth the facts underlying its statement of opinion, and those statements are true, the Constitution protects that opinion from liability for defamation.")

**iii. "This model cannot produce a reasonable profit for any legitimate and qualified contractor."**

The above statement is non-actionable opinion because it merely expresses the author's belief that no "reasonable" profit can result from NIP's proposed business model for any "legitimate" or "qualified" contractor. What amount of profit is "reasonable" and what contractors are

"legitimate" and "qualified" are all subjective inquiries, and the statement as a whole thus cannot reasonably be construed to state or imply facts susceptible of being proved false. Even if the statement and its constituent terms could be construed to state or imply such facts, Plaintiffs have not produced evidence of falsity. They produce only Mr. Reid's declaration, in which Mr. Reid states "[t]he subject profit model can and does provide profitability for large and small contractors alike."(Reid Decl. in Support of Application for Temporary Restraining Order, ¶ 19(d)). However, Mr. Reid does not state whether the "profitability" provided by the model is "reasonable," indicate how much profit is produced, or specify whether the "large and small contractors" for whom he asserts the model provides profitability are "legitimate" or "qualified." Consequently, Plaintiffs have not shown a likelihood that the "reasonable profit" statement can support their libel claims.

**iv. "In the example used, wherein Home Depot takes 13% and NIP takes another 11% from the gross estimate, and where overhead costs are properly calculated, the NIP example results in a *netloss*."**

**\*19** Plaintiffs argue that this statement is false because the "Paint, Materials, and Labor" item in NIP's profit analysis already incorporates gas, taxes, liability insurance, "labor burdens," and "[a]dvanced costs and equipment replacement" (collectively, the "omitted items") and as such does not result in a net loss. (Reply to Opposition to Order to Show Cause, p. 19.) Although the statement is factual, and Plaintiffs present evidence that it is false, Plaintiffs have failed to show that serious questions exist as to whether PDCA acted with the required malice when it wrote the statement. On a product disparagement claim, a plaintiff is required to prove actual malice by showing the defendant acted "with knowledge that the statement was false or with reckless disregard as to whether or not it was true."*Suzuki Motor Corp.,* 330 F.3d at 1133 (holding that plaintiff Suzuki Motors Corp. was required to prove actual malice in a product disparagement suit against Consumers Union, Inc.); *Unelco Corp. v. Rooney,* 912 F.2d 1049, 1056 (9th Cir.1990)(statements about the quality of a rain-repellent product for car windshields are a matter of public concern because it is in the public interest to discourage the marketing of defective products.) To meet this standard, a plaintiff must show that the defendant "actually had a high degree of awareness of probable falsity" or was actually aware of the falsity. *Id.*

Plaintiffs present no evidence that PDCA had any way of knowing that the omitted items actually were included in NIP's profit model in the category "Paint, Materials, and Labor." The NIP calculation does not explicitly list the items, nor do Plaintiffs contend that the NIP literature containing the calculation explained that the omitted items already had been accounted for. Moreover, the omitted items' inclusion likely would not have been obvious to PDCA, because items such as gas, taxes, and liability insurance are not obviously susceptible to inclusion in a category entitled "Paint, Materials, and Labor." In the absence of evidence that PDCA knew the sample profit calculation included the omitted items or that PDCA actually had a high degree of awareness of that the items probably were included, Plaintiffs have not shown a likelihood of success on their libel claims as to the net loss statement.

**v. "NIP would accumulate over $3 million to manage a portion of Home Depot's paint services and give few services back to the contractors who *earned* the money!"**

The above statement appears in the following paragraph from the NIP Article:

> Perhaps the most interesting question is whether the organized profession and industry wishes this [industry roll-up] to happen. If the answer is "yes," then going to work for Home Depot and NIP makes sense. If the answer is "no," then independent contractors should not enter into any agreements like the one proposed by NIP and Home Depot. Let's take a look at the business math. NIP is seeking $3,000 each year for each store. That is $1.5 million for the 500 stores given them. They are seeking 11% from every dollar earned by contractors. Based on their math, that is another $1.65 million. NIP would accumulate over $3 million to manage a portion of Home Depot's paint services and give few services back to the contractors who *earned* the money!"

**\*20** Plaintiffs argue that the "few services" statement is false because "NIP provides a national support team."(Reply to Opposition to Order to Show Cause, p. 20.) However, the statement cannot reasonably be construed as asserting facts susceptible to being proved false, because it is a pure opinion that the services NIP

provides are "few." While the statement also can be construed to imply that the services are inadequate compared to the work contractors perform, such a comparison also would be a non-actionable statement of opinion.

**c. Conclusion: Actionable Statements**

To summarize the above discussion of Plaintiffs' Lanham Act and defamation claims, the Court finds Plaintiffs have not shown the existence of serious questions on the merits of those claims except with respect to the statement in the CWP Article regarding licensing.

**3. Interference with Business Advantage Claims**

In addition to the libel claims, Plaintiffs assert claims for intentional interference with existing business advantage and intentional interference with prospective business advantage. These claims require, *inter alia,* that a plaintiff demonstrate disruption of an economic relationship between the plaintiff and a third party by conduct that is "independently wrongful," or violative of some constitutional, statutory, common law, or other legal standard. *Stevenson Real Estate Services, Inc. v. CB Richard Ellis Real Estate Services, Inc.,* 138 Cal.App.4th 1215, 1220, 42 Cal.Rptr.3d 235 (2006). The conduct must be wrongful "by some measure beyond the fact of the interference itself."*Id. (quoting Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 392–93, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995)).

Here, Plaintiffs argue that PDCA interfered with its existing and prospective economic advantage by posting the challenged statements. The alleged wrongfulness is the statements' defamatory nature. However, as Plaintiffs have failed to show serious questions on the merits of their libel or Lanham Act claims except with respect to the licensing statement, they also have failed to show the existence of such questions as to the interference with business advantage claims except as to the licensing statement.

Even with respect to the licensing statement, however, Plaintiffs have failed to demonstrate serious questions on the merits of their interference claims because they have not presented evidence that PDCA engaged in acts "designed to disrupt" known economic relationships between Plaintiffs and third parties. *See Stevenson,* 138 Cal.App.4th at 1220, 42 Cal.Rptr.3d 235 (a claim for intentional interference with business advantage requires the plaintiff to show "intentional acts [on the part of the defendant] designed to disrupt [a] relationship" between the plaintiff and third parties.) As to the CWP article, Plaintiffs have not shown that PDCA acted with knowledge of any relationships between Plaintiffs and specific third parties. As to the NIP Article, although PDCA knew of NIP's relationship with Home Depot, and it is possible the NIP Article could have a detrimental impact on that relationship, Plaintiffs have not shown that PDCA's act of publishing the NIP Article was "designed" to cause such detrimental impact. Consequently, Plaintiffs have failed to show the existence of serious questions as to their interference with business advantage claims.

**B. Balance of Hardships/Irreparable Injury**

**\*21** As to the CWP article's licensing statement, Plaintiffs have shown that the balance of hardships tips sharply in their favor, and that they are likely to sustain irreparable injury if the statement is not removed. Threatened loss of business goodwill supports a finding of the possibility of irreparable harm. *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.,* 240 F.3d 832, 841 (9th Cir.2001). Plaintiffs argue, and present evidence, that the licensing statement threatens them with irreparable harm because their reputation and goodwill will be damaged with customers, employees, prospective CWP interns, and "others as well as within the industry."(Application for Temporary Restraining Order, p. 19.) Plaintiffs also have presented evidence that CWP's national sales have slowed significantly in the weeks since PDCA first posted the CWP article on its website, measured against NSG's forecasts for CWP's businesses. (Reid Decl., ¶ 24.) This threatened harm outweighs any burden on PDCA from a requirement that it remove the licensing statement from its website. The Court therefore will issue a preliminary injunction requiring PDCA to remove the licensing statement from its website.

**III. Conclusion**

For the foregoing reasons, Plaintiffs' application for a preliminary injunction is DENIED except with respect to PDCA's statement in the CWP Article, "I think College Works Painting tries to avoid doing business in states where licensing is required."The Court will issue, concurrently with this Order, an order preliminarily enjoining PDCA from publishing the licensing statement on its website.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2035465

**National Services Group, Inc. v. Painting & Decorating..., Not Reported in...**
2006 WL 2035465

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.